[Cite as *Akers v. Ohio State Univ. Med. Ctr.*, 2010-Ohio-4972.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

LARRY R. AKERS

      Plaintiff

      v.

OHIO STATE UNIVERSITY MEDICAL CENTER

      Defendant
      Case No. 2008-02029

Judge Joseph T. Clark

DECISION

{¶ 1} On February 7, 2008, plaintiff timely refiled this action against defendant, Ohio State University Medical Center (OSUMC), alleging medical malpractice. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} Plaintiff testified that he was employed in 2001 as a janitor for a local school district. According to plaintiff, who is diabetic, he had suffered from kidney failure for several months which was treated with peritoneal dialysis at home. Plaintiff's son, Roger, agreed to donate a kidney for transplant. Plaintiff was admitted to OSUMC on February 5, 2001, and the transplant was performed on February 6, 2001. Plaintiff testified that his initial recovery was uneventful and that on the day after surgery, he learned that his son was not faring as well. Plaintiff recalled that he asked to be transported to his son's room and prior to such action, a nurse covered his intravenous (IV) port area so that he could shower. Plaintiff testified that he did not recall whether

the nurse flushed the shower before he entered the enclosure, only that he remembered turning the shower on.

{¶ 3} Plaintiff further testified that he felt well up until the day on which he was discharged, February 13, 2001. According to plaintiff, he began to feel ill during that afternoon; however, despite his protestations, he was discharged in the evening. Plaintiff testified that he began vomiting at home and was febrile. He returned to OSUMC the next morning and remained hospitalized during the following two weeks.

{¶ 4} Plaintiff was diagnosed with Legionnaires Disease (LD), a form of pneumonia caused by a bacteria known as Legionella. Because the immune systems of transplant patients are suppressed, defendant had established certain protocols to prevent transplant patients from becoming infected with Legionella. The following restrictions were in effect at the time of plaintiff's transplant: 1) no live flowers or plants in patient rooms; 2) bottled water only for drinking; 3) ice only if brought into the unit from Rhodes Hall; and 4) nursing personnel to flush the shower with hot water for 10 minutes with the bathroom door closed, then allow the shower to settle for ten minutes with the door closed before a transplant patient could take a shower. (Defendant's Exhibit 2.)

{¶ 5} Plaintiff alleges that defendant failed to inform him about the shower protocol; that defendant failed to flush the shower for him; and that he contracted LD as a result of these failures.

{¶ 6} Plaintiff's wife, Kay Akers, testified that she was present when the transplant unit policies were explained by a nurse and that she complied with the regulations; i.e., she did not bring any fountain drinks, ice, or potted plants into the hospital room. She further testified that she remembered a nurse helping plaintiff prepare for a shower by covering his IV site and his incisional area. According to Mrs. Akers, plaintiff showered and dressed alone in the bathroom.

{¶ 7} Patricia Kulich, a registered nurse (RN) employed by defendant as an infection control practitioner, testified that defendant actively monitors the water supply for Legionella by testing samples from the sinks in select hospital rooms on a quarterly basis. According to Kulich, on February 15 or 16, 2001, she checked the sinks from plaintiff's prior hospital rooms and that the showerhead was also cultured at the request

of Mrs. Akers. The cultures from both rooms were negative for Legionella. (Defendant's Exhibit 17.)

{¶ 8} Kulich also described the shower flush policy that OSUMC requires for its transplant patients. (Plaintiff's Exhibit G.) She opined that the purpose of the shower protocol is to remove any stagnant water that is in the pipes leading up to the showerhead because Legionella prefer water that is cooler, at 90 to 115 degrees. Kulich testified that OSUMC's infection control policy meets the standards set by the Centers for Disease Control (CDC). Kulich explained that a culture which grew less than ten colonies was considered a negative result.

{¶ 9} Beth Steinberg, RN, who was a clinical nurse specialist in the transplant unit in February 2001, testified that she was in charge of orienting new staff to the unit, that nurses are taught the shower protocol during orientation, and that the shower flush is performed as a matter of course on the transplant unit.[1] Steinberg added that she reinforced daily to her staff the policies in place regarding use of bottled water, the shower flush protocol, and the need to ensure that ice came only from Rhodes Hall where it was sterilized for use by transplant patients.

{¶ 10} According to Steinberg, plaintiff could not possibly have showered on February 7, 2001, inasmuch as immediately after surgery he was transferred to a special care unit for 24 hours. During that time, plaintiff's heart rate was continuously monitored, a central intravenous catheter was in place to maintain the correct volume of IV fluids administered, and he had oxygen supplementation and a urinary catheter in place. According to the postoperative orders, plaintiff was permitted to sit up and dangle his feet over the side of the bed during the first 12 hours after surgery, and he was allowed only to sit up in a chair the following morning. (Joint Exhibit 1, Tab 50.) Steinberg referenced the nurses' flow sheet which documented that plaintiff returned to a regular post-transplant room at 4:20 p.m. on February 7, 2001. (Defendant's Exhibit 7.)

{¶ 11} Steinberg also testified that a notation in plaintiff's chart referenced a dressing that was changed on February 10, 2001, after plaintiff had showered. (Plaintiff's Exhibit I.) According to Steinberg, that is the only documentation that plaintiff

had ever showered while on the unit. (Defendant's Exhibit 11.) She maintained that the water policies are so ingrained in the day-to-day tasks that use of bottled water or performance of a shower flush is not routinely documented in a patient's chart.

{¶ 12} Diane Lemly, a nurse who has worked on the transplant unit since 1999, testified that she admitted plaintiff to the unit and that she reviewed with him the unit policies including the limitations related to bottled water and the shower flush. (Defendant's Exhibit 4.) Lemly also asserted that it would have been very unlikely that plaintiff showered the day after transplant surgery. She opined that he most likely was assisted with personal hygiene by nursing staff members that day.

{¶ 13} Jan Pfeuffer, who began working as a nurse in the transplant unit in 1997, testified that plaintiff's medical records document that she cared for him on February 9, 2001, and that plaintiff was still on oxygen, with a urinary catheter in place and that plaintiff received assistance with bathing while he remained in bed. (Defendant's Exhibit 10.) According to Pfeuffer, the shower flush is always performed even though such actions are not charted. She insisted that the shower flush is performed every time as standard practice on the unit. Upon cross-examination, Pfeuffer opined that plaintiff would not have been able to shower after 4:00 p.m. on February 7, 2001, when he returned to the unit, inasmuch as he was still receiving supplemental oxygen. In addition, she noted that the dressing over the incision must remain sterile and in place for the first 48 hours after transplant.

{¶ 14} Plaintiff's expert, Ronald Geckler, M.D., Chairman of the Infection Control Department at Mercy Medical Center which is affiliated with the University of Maryland, testified via videotaped deposition that he has treated approximately 20 to 50 patients with LD, that transplant patients who are immunosuppressed are more susceptible to infection and are more likely to manifest a severe form of LD if infected, and that the CDC has recognized showering as one mode of transmission of LD. He explained that Legionella can be contracted from exposure to contaminated water droplets in the air or the water supply, through either inhalation of airborne bacteria or by drinking contaminated water that inadvertently goes into one's lungs, known as aspiration. He

---

[1]Steinberg also stated that a copy of the water policies and restrictions is provided to nursing personnel who periodically "float" from other units to the transplant unit.

also testified that LD has an incubation period of two to ten days after exposure and that the onset of symptoms occurs during a similar time frame, or somewhat longer.

{¶ 15} Dr. Geckler opined that plaintiff acquired LD while he was hospitalized at defendant's facility. He based his opinion on the circumstances presented: 1) that plaintiff first manifested symptoms of LD on the evening of February 13, 2001; and 2) that plaintiff remained hospitalized for the vast majority of the incubation period from two to ten days prior to the onset of LD. Dr. Geckler discounted, as remote, the possibility that plaintiff was exposed to the bacterium prior to his admission to OSUMC, or that he had contaminated water residing in his throat which was then introduced into his lungs during intubation immediately prior to surgery.

{¶ 16} Dr. Geckler opined that the shower was the most likely source of plaintiff's infection, that it was a deviation from the standard of care for defendant to allow plaintiff to shower without following the shower protocol, and that such acts or omissions were the proximate cause of plaintiff's LD. Dr. Geckler acknowledged that defendant's program for monitoring the hospital's water supply for Legionella met the standard of care.

{¶ 17} Upon cross-examination, Dr. Geckler admitted that he was critical of defendant for even allowing transplant patients to take showers, despite the knowledge that other experts in the field of infectious disease assert that it is acceptable practice to allow transplant patients to shower, and that OSUMC's practice of allowing transplant patients to shower was not a deviation from the standards set forth in the 1997 CDC guidelines which remained in effect in 2001.[2] Further, Dr. Geckler conceded that it is not a deviation from the standard of care for Legionella to be present in the hospital's water supply, and that a patient could contract LD in a hospital without any negligence on the part of the hospital. In order to prevail on a claim of medical malpractice or professional negligence, plaintiff must first prove: 1) the standard of care recognized by the medical community; 2) the failure of defendant to meet the requisite standard of care; and 3) a direct causal connection between the medically negligent act and the injury sustained. *Wheeler v. Wise* (1999), 133 Ohio App.3d 564; *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127. The appropriate standard of care must be proven

---

[2]Indeed, Dr. Geckler based his opinion, in part, upon the guidelines released by the CDC in 2003.

by expert testimony. *Bruni* at 130. That expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. Id.

{¶ 18} "In a negligence action involving the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and, that the nurse's negligence, if any, was the proximate cause of the patient's injury." *Ramage v. Cent. Ohio Emergency Serv.*, Inc., 64 Ohio St.3d 97, 1992-Ohio-109, paragraph one of the syllabus.

{¶ 19} Dr. Julie Mangino, defendant's Medical Director of Epidemiology, testified that she is board-certified in infectious diseases and that she directs the infection prevention and control programs at OSUMC. According to Dr. Mangino, OSUMC routinely cultures the faucets in select rooms and cultures are taken from showerheads only if a suspected infection occurs. She testified that OSUMC's program was in compliance with the CDC guidelines that were in force in 2001. Finally, Dr. Mangino stated that, in her opinion, Legionella is not transmitted by aerosolization.

{¶ 20} Dr. Robert Muder, who is board-certified in internal medicine with a sub-specialty in infectious disease, testified that LD is caused mainly by having the Legionella bacteria enter the lungs via aspiration, not from showering. He explained that aspiration can occur during intubation, or when a nasogastric tube is in place. He opined that in 2001, OSUMC's Legionella policies and protocols exceeded the guidelines set forth by the CDC; that plaintiff did not acquire LD as the result of showering; and that even assuming the shower was not flushed according to the transplant unit protocol, failure to flush the shower prior to patient use does not fall below the standard of care. Dr. Muder maintained that there are so few colonies of Legionella produced during a shower that one would have to be in the shower for several hours to acquire LD.

{¶ 21} Based upon all the evidence adduced at trial, the court finds that the Akers' testimony that plaintiff showered the day after transplant surgery was not credible. Indeed, the court finds that the only credible evidence documenting that plaintiff ever showered is the reference that a nurse changed plaintiff's CVC dressing on February 10, 2001, after he showered. Moreover, even if plaintiff had showered on

February 7, 2001, based upon the credible testimony given by the nursing personnel that the shower flush was standard procedure, that it was always done as a matter of course, and that such a routine act was not charted, the court finds that plaintiff has failed to prove by a preponderance of the evidence that defendant did not perform the shower protocol either on February 7, 2001, or on February 10, 2001. Rather, the court finds that in all probability the shower flush was performed.

{¶ 22} Furthermore, the court finds that even if the shower flush were not performed, plaintiff has failed to prove that showering was the proximate cause of his LD. Although Dr. Geckler opined that plaintiff contracted LD from the shower, Dr. Muder maintained that it would be unlikely for a patient to acquire Legionella as a result of showering. Based upon a review of all the testimony, the court is persuaded that it was just as likely that plaintiff was either infected with the bacterium prior to his admission, or that the organism was introduced into his lungs during intubation.

{¶ 23} "In order to recover against a defendant in a tort action, plaintiff must produce evidence which furnishes a reasonable basis for sustaining his claim. If his evidence furnishes a basis for only a guess * * * as to any essential issue in the case, he fails to sustain the burden as to such issue." *Landon v. Lee Motors, Inc.* (1954), 161 Ohio St. 82, at paragraph six of the syllabus.

{¶ 24} In the final analysis, the court is not convinced that plaintiff contracted LD as a result of any negligence on defendant's part. For the foregoing reasons, the court finds that plaintiff has failed to prove by a preponderance of the evidence that defendant caused his illness or failed to perform some act that would have prevented the transmission of the disease to him. Accordingly, judgment shall be rendered in favor of defendant.

## Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

LARRY R. AKERS

Plaintiff

v.

OHIO STATE UNIVERSITY MEDICAL CENTER

Defendant
 Case No. 2008-02029

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

This case was tried to the court on the issue of liability.  The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant.  Court costs are assessed against plaintiff.  The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Jason K. Wright
Sarah J. Wolske-Donaldson
Walter J. Wolske Jr.
580 South High Street, Suite 300
Columbus, Ohio 43215

Timothy T. Tullis
Traci A. McGuire
Special Counsel to Attorney General
Capitol Square Office Building
65 East State Street, Suite 1800
Columbus, Ohio 43215-4294

Paula Luna Paoletti
Assistant Attorney General
150 East Gay Street, 18thFloor
Columbus, Ohio 43215-3130

SJM/cmd
Filed September 28, 2010

To S.C. reporter October 12, 2010